[No. 19384.  Department Two.  January 13, 1926.]

# A. H. ANDREWS & SON, *Appellants*, v. AMOS HARPER, *et al., Respondents*.[1]

[1] SALES (101)—MAKING AND REQUISITES OF EXPRESS WARRANTY—
STATEMENTS CONSTITUTING WARRANTY. A retailer's general
recommendation of a well known and generally used stock feed
as a "great milk maker," "fine feed" and a "good feed," is mere
"seller's praise," and is not an express warranty against any
defect in any particular lot.

[2] SAME (105)—IMPLIED WARRANTY OF QUALITY—SALE BY DEALER.
Such a retailer's general recommendation made one year before
the sale of a particular lot, is not an express warranty that such
lot would be free from any deleterious or poisonous substance,
different from the data branded upon the original packages.

[3] SAME (105). A retailer's general recommendation and sale of a
well known and generally used stock feed, sold in the original
packages branded with a statement of the ingredients in com-
pliance with Rem. Comp. Stat., § 7018, carries no implied war-
ranty against the retailer that any particular lot is free from
any foreign deleterious or poisonous substance, where the re-
tailer was free from negligence.

[4] APPEAL (487)—DETERMINATION—MATTERS DETERMINED WITHOUT
FURTHER PROCEEDINGS. Upon reversing a judgment for defend-
ant, based upon an insufficient and illegal counterclaim, in which
there is no dispute as to the amount of plaintiff's claim, judg-
ment will be directed for plaintiff therefor.

Appeal from a judgment of the superior court for
Clarke county, Smith, J., entered October 27, 1924,
upon findings in favor of defendants in an action on
contract, tried to the court.  Reversed.

*Miller, Wilkinson & Miller*, for appellants.

*W. F. Magill*, for respondents.

PARKER, J.—The plaintiffs, Andrews & Son, com-
menced this action in the superior court for Clarke
county, seeking recovery of an alleged balance due

[1]Reported in 242 Pac. 27.

12—137 WASH.

them from the defendants, Harper and wife, upon the purchase price of dairy stock feed. The defendants answered and cross-complained, setting up a claim of damages alleged to have resulted to their cows from the use of one small lot of the feed, exceeding the balance due upon the purchase price of the whole thereof. A trial before the court sitting without a jury resulted in findings and judgment awarding to Harper and wife recovery of damages for $395.51 in excess of the balance due upon the whole of the purchase price. From this disposition of the case Andrews & Son have appealed to this court.

Andrews & Son have been retail dealers in dairy and other livestock feed since prior to January, 1923, during which period they have been selling to dairymen in the neighborhood of the small town where they maintain their business a feed known and branded as "Lilly's Golden Dairy Feed," a generally well-known feed compounded and sold at wholesale to retail dealers by the well-known wholesale concern of Lilly & Company of Seattle. This feed, after being compounded, is put up in bags by Lilly & Company, securely sewed, with a view of the retail dealers selling it to dairymen without opening the sacks; that is, with a view of the feed being sold at retail to the consumer in the original packages. Each of the bags is plainly branded with the name of Lilly & Company as the maker or compounder, the name of the feed, and a statement of the ingredients from which the contents are compounded; this, manifestly, to comply with the requirements of § 7018, Rem. Comp. Stat., relating to "concentrated commercial feeding stuffs." Between January 19, 1923, and January 5, 1924, from time to time, Andrews & Son sold to Harper and wife dairy feed, assuming it all to be of good quality, of the value of $1,230.93.

There were paid upon these sales from time to time sums aggregating $585.44, leaving an unpaid balance of $645.49. These sales apparently were made for the most part of Lilly's Golden Dairy Feed. On September 23, 1923, one of these sales was made of that feed from Andrews & Son to Harper and wife. This is the only lot complained of as containing any foreign dele-terious or poisonous substance. We shall assume, as we proceed, that that lot did contain some foreign dele-terious or poisonous substance, and, upon being fed to the cows of Harper and wife, caused damage to them to the extent found by the trial court.

[1] Since Harper and wife rest their right to re-cover damages upon a warranty made by Andrews & Son as to the quality of the particular lot of Lilly's Golden Dairy Feed sold and delivered on September 23, 1923, it seems necessary that we take pains to ascer-tain just what was said, and when it was said, pertain-ing to any such possible warranty. There is no writing evidencing any warranty by Andrews & Son. All that was orally said, and when it was said, having any possible bearing upon the question of warranty, is evi-denced only by the testimony of Harper and his wife. Mr. Harper testified as follows:

"Q. You may state when and under what circum-stances you commenced to use the Golden Dairy Feed? A. I was feeding the oat meal feed and went up for some and they was out of it. Q. Up where? A. Up to Andrews' store. And they said they was out of the ground oats and wanted me to try some of the Lilly feed, Golden Dairy Feed, and said it was a great milk maker. Q. What all did he say about it? A. I don't remember what all he did say about it. Anyway, it was fine feed—said it was good feed and he would recom-mend it for a milk maker. Q. Had you ever used that feed before? A. No; never used any dairy feed before. Q. How then did you come to buy this? A. Well, they was out of the other and I thought I would try some of

it on his word and see what effect it would have, see if it was good, so I took a ton of it. It was good feed all right at that time. Q. Along in September you got some feed of that kind, about the latter part of September, didn't you? A. Yes. . . . Q. What if anything did he say about this dairy feed as compared with any other dairy feed, if anything? A. Well, he said it was as good as any. . . ."

Mrs. Harper testified as follows:

"Q. You had been buying this—. A. Golden Dairy Feed? Q. Yes. You had been buying that feed and using it for some time? A. Yes, sir. Q. How long? A. I don't just remember. It was over a year. . . Q. You had been feeding that about a year as you say? A. Yes, sir; started feeding it at Mr. Andrews' recommendation."

The record contains no other evidence of any words of warranty passing between the parties.

Was there any express warranty, as insisted upon by counsel for Harper and wife? It is apparent that whatever was said by Andrews or his son about the quality of Lilly's Golden Dairy Feed was all said at the time of the first purchase of that kind of feed by Harper and wife, which plainly was a long time, approximately a year, prior to the sale and delivery to them of the particular feed purchased on September 23, 1923, which is claimed to have caused the damage for which recovery is here sought. The substance of the recommendation or praise of the feed by Andrews & Son, as testified to by Mr. Harper, is that they "said it was a great milk maker," "it was fine feed," "it was good feed" and that "he would recommend it for a milk maker;" and, as testified to by Mrs. Harper, they "started feeding it at Mr. Andrews' recommendation." This, we think, was only a general recommendation of Golden Dairy Feed, and seems to us falls short of an express warranty as against any such defect in any

particular lot as is here drawn in question. If this recommendation can in any event be regarded as more than what is in law commonly termed "seller's praise," it in no event was a warranty beyond an assurance that, speaking generally, Lilly's Golden Dairy Feed was a good dairy feed. We think our decisions in *Smith v. Bolster,* 70 Wash. 1, 125 Pac. 1022; *Carver-Shadbolt Co. v. Loch,* 87 Wash. 453, 151 Pac. 787, L. R. A. 1917C 1076, and *Hoyt v. Hainsworth Motor Co.,* 112 Wash. 440, 192 Pac. 918, lend strong support to this conclusion.

[2] There is, however, another reason why that recommendation of Golden Dairy Feed by Andrews & Son to Harper and wife cannot be of any avail to them as an express warranty here; and that is, because that recommendation as to the feed in general was made approximately a year before the sale and delivery on September 23, 1923, of the particular lot of feed which, it is claimed, caused the damage for which recovery is here sought. That recommendation was in no event an express warranty that the original packages sold and delivered by Andrews & Son to Harper and wife a year thereafter would not contain any deleterious or poisonous substance, or any substance differing from that of which Golden Dairy Feed was composed according to the data branded upon the original packages. That general recommendation was admittedly fully justified, for Harper testified that "it was good feed all right at that time." Indeed, Golden Dairy Feed is admittedly good feed, speaking generally. It was only the foreign deleterious or poisonous substance that somehow got into the original packages put out by Lilly & Company during the latter part of September, 1923, that caused this complaint.

[3] There is no evidence of any express warranty by words, oral or written, at the time of or with refer-

ence to the feed sold and delivered on September 23, 1923. We have then remaining only the question as to whether or not there was then in law any implied warranty rendering Andrews & Son liable in damages for any foreign deleterious or poisonous substance which might be in the original packages of that particular lot of Golden Dairy Feed. We are of the opinion that whatever warranty the law would imply as being made by Andrews & Son attending the making of that particular sale and delivery, as to the contents of the original packages then delivered, such implied warranty would in no event go to the extent of warranting that that particular lot, all of which was in the original packages and so sold and delivered to Harper and wife, would not contain any foreign deleterious or poisonous substance. Andrews & Son manifestly were not supposed to open and inspect the original packages while in their possession and were not supposed to know their contents other than as they were informed by the data plainly stamped upon each package; which information was equally apparent to Harper and wife upon their purchasing and receiving the packages. Our decision in *Hoyt v. Hainsworth Motor Co., supra,* it seems to us, is all but conclusive against the contentions here made in behalf of Harper and wife. The substance of our decision in that case is well stated in the syllabus thereto as follows:

"A dealer selling an automobile of a particular model, of which he was known not to be the manufacturer, is not liable to the purchaser upon an implied warranty against latent defects which he could not have discovered by ordinary inspection and tests; his duty being fulfilled when he delivered a car of the particular model contracted for."

It seems to us that the latent defect in the particular lot of feed here in question was plainly not such a de-

fect as Andrews & Son were required to search for and discover, and that the risk of there being such a defect, that is, there being such foreign deleterious or poisonous substance in those particular bags, was assumed by Harper and wife in so far as any liability therefor on the part of Andrews & Son is concerned; though this would probably not be the rule touching the question of liability of Lilly & Company to Harper and wife. under our decision in *Mazetti v. Armour & Co.,* 75 Wash. 622, 135 Pac. 633, Ann. Cas. 1915C 140, 48 L. R. A. (N. S.) 213. The decisions in *Clement v. Rommeck,* 149 Mich. 595, 113 N. W. 286, 13 L. R. A. (N. S.) 382, and *Walden v. Wheeler,* 153 Ky. 181, 154 S. W. 1088, 44 L. R. A. (N. S.) 597, lend strong support to our conclusion here reached. The evidence, we think, plainly negatives negligence on the part of Andrews & Son in not discovering the foreign substance in the feed on or before September 23, 1923. They did, upon finding such fact as probably existing, promptly warn Harper and wife not to feed any more of that lot to their cows, and replaced it with other good feed, but a small amount of it having been fed to the cows of Harper and wife.

What we have already said renders it unnecessary for us to make inquiry touching the question as to whether or not the injury to the cows of Harper and wife as a matter of fact resulted from the foreign substance in the feed in question.

[4] The judgment of the superior court is reversed; and, since there is no controversy as to the reasonable value of the feed sold and delivered from Andrews & Son to Harper and wife during the time in question, and no question as to the balance of $645.49 due therefor, Andrews & Son having furnished other feed in place of that which was sold and delivered on September 23, 1923, the case is remanded to the superior court

with directions to render its judgment in favor of Andrews & Son and against Harper and wife for the balance of $645.49 due upon the whole purchase price, with legal rate of interest thereon from and after January 5, 1924. ·

TOLMAN, C. J., MAIN, MITCHELL, and MACKINTOSH, JJ., concur.